Below is a Memorandum Decision of the Court.



**Marc Barreca**
**U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

–

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| In re: | |
| MICHAEL R. MASTRO, | Case No. 09-16841-MLB |
| Debtors. | |
| | |
| JAMES F. RIGBY, CHAPTER 7 TRUSTEE OF MICHAEL R. MASTRO, | Adversary No. 14-01043-MLB |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION REGARDING PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| MICHAEL J. CORLISS, et al., | |
| Defendants. | |

This matter came before me on March 30, 2017 on opposing motions for summary judgment, brought by Plaintiff, James F. Rigby Jr., Chapter 7 Trustee (the "**Trustee**") for the bankruptcy estate of Michael R. Mastro ("**Mastro**")[1], and Defendants, Michael Corliss ("**Corliss**") and Kara King ("**King**"). The Trustee was represented by Paul Brown of Karr Tuttle Campbell and Rick Rein of Horwood Marcus

_____

[1] *Michael R. Mastro*, 09-16841-MLB (Bankr. W.D. Wash filed July 10, 2009).

MEMORANDUM OPINION - 1

& Berk Chartered.  Corliss and King were represented by Jeff Coopersmith, Hugh McCullough, and Thomas Wyrwich of Davis Wright Tremaine LLP.  Following oral argument, I took the matter under advisement.  Now, having fully considered the matter and being fully advised, I dismiss the fraudulent transfer claim against King, and deny the remainder of both the Trustee's and Corliss' motions for summary judgment.

## Jurisdiction

I have subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and pursuant to the order of Judge Lasnik referring this case to me for all pretrial proceedings.  *See* Dkt. No. 26.[2]

## Relevant Facts

### A.    Corliss

Corliss is the Chief Executive Officer and sole shareholder of Investco Financial Corporation ("**Investco**").[3]  (Dkt. No. 221-4 at 21).[4]  His wife is Lauri Corliss ("**Lauri**").  (Dkt. No. 221-3 at 3).

### B.    King

King is Corliss's executive assistant.  (Dkt. No. 221-3 at 5).  She was a signatory on numerous of his business and personal accounts, at numerous different banks.  (Dkt. No. 221-3 at 5).

### C.    Mastro

Mastro was a prominent real estate developer in the Pacific Northwest from the late 1960s until his bankruptcy in 2009.  He was also heavily involved in "hard money" lending.  His wife is Linda Mastro ("**Linda**").  (*See Rigby v. Mastro,* et al., 09-01439-MLB (filed Sept. 29, 2009), Dkt. No. 824).

---

[2] Unless otherwise noted, all docket references herein are to *Rigby v. Corliss,* et al., 14-01043-MLB (Bankr. W.D. Wash. filed Jan. 21, 2014).

[3] Investco's stock is owned by a trust, of which Corliss is the sole beneficiary.  (Dkt. No. 221-4 at 21).

[4] Exhibit numbers refer to the exhibit number in ECF, and pagination refers to the page number of the PDF exhibit.

MEMORANDUM OPINION - 2

**D.     The Relationship between Corliss and Mastro**

In 1985, Corliss met Mastro.  Mastro owned a roof-truss manufacturing business, which Mastro sold to Investco.  Although Corliss did not negotiate the terms of the sale with Mastro, Corliss met Mastro when he signed the purchase agreement.  (Dkt. No. 221-3 at 4).

Corliss asserts that after 1985, Mastro's and his companies did not directly do business again. (Dkt. No. 218-6 at 3).  He asserts that Mastro and he occasionally saw each other three to four times per year at social functions and that Mastro sometimes called Corliss for his opinions on real estate transactions.  (Dkt. No. 221-3 at 13-15).  The Trustee asserts that the relationship between Mastro and Corliss was far more close-knit than portrayed by Corliss.

**E.     Mastro's Financial Decline, Dealings with Corliss, and Bankruptcy**

By early 2008, the real estate market began to decline both nationally and in the Pacific Northwest.  (09-01439-MLB, Dkt. No. 824 at 5).  The decline in the market severely impacted Mastro's business.  (*Id.*).  Mastro was unable to comply with all the demands that lenders were making for payment or additional collateral on his maturing bank debt.  (*Id.*).  Moreover, Mastro's hard money borrowers – mostly real estate developers - were unable to pay, and Mastro's second and third collateral positions declined significantly in value.  (*Id.* at 5-7).

a.     Mastro Purchases Gold Bars.

On approximately March 23, 2009, Mastro purchased 100 gold bars for a payment of $99,300. (*Id.* at 25).  The gold bars were shipped to Mastro's and Linda's Medina residence on April 15, 2009.[5] (*Id.*).

---

[5] On September 27, 2011, I found that the gold bars existed on the date of petition, that Mastro and Linda had at all times known where the gold bars were located, and that the gold bars were currently in Mastro's and Linda's possession or control.  I further concluded they were property of the estate.  (*See* 09-01439-MLB, Dkt Nos. 783, 824 at 25).

MEMORANDUM OPINION - 3

b. Mastro's Bankruptcy

In July 2009, several banks commenced an involuntary Chapter 7 bankruptcy against Mastro. (*Michael R. Mastro*, 09-16841-MLB, Dkt. No. 1 (filed July 10, 2009)). On August 21, 2009, the Bankruptcy Court entered an Order for Relief and Judgment Granting Petition for Involuntary Chapter 7 Petition. (09-16841-MLB, Dkt. No. 97). Mastro's schedules valued his assets at approximately $384.6 million and his liabilities at approximately $581 million. (Dkt. No. 221-1 at 3; Dkt. No. 221-2 at 3). Mastro did not disclose on his schedules the 100 gold bars that he had purchased pre-petition. (*See* 09-16841-MLB, Dkt. Nos. 190, 398).

c. Mastro Arranges for his Anticipated Inheritance from his Sister to be Paid to Corliss

Mastro anticipated receiving an inheritance from the estate of his terminally ill sister, Cecilia Campbell ("**Campbell**"). (Dkt. No. 221-6 at 17). Around August 1, 2010, Mastro sent his sister, Gloria Plischke ("**Plischke**"), a letter advising her that he had "transferred my interest in Cec's estate to Michael J. Corliss… Please divide my share into two checks, make payable to 'Investco' and mail to me as I will forward to Corliss." (Dkt. No. 221-6 at 10, 12, 21). Campbell died on September 24, 2010. (Dkt. No. 221-6 at 3-4).

d. Corliss Transfers $50,000 to Mastro; Mastro Transfers Gold to Corliss

On or about January 17, 2011, Mastro and Corliss met in Palm Desert, California to discuss Corliss loaning money to Mastro for living expenses. Dkt. No. 221-1 at 5. Corliss was aware that Mastro was in bankruptcy. (Dkt. No. 221-5 at 9-12). Corliss asserts that he agreed to lend Mastro $50,000, because "I guess I was just in a position to be able to say, you know, if I could help him . . . that's something that I did and would do." (Dkt. No. 221-3 at 12). Corliss asserts that someone in his office prepared a $50,000 note, that the note was mailed Mastro, and that Mastro signed the note and mailed it back. (Dkt. No. 221-3 at 6-7). The note identified the transaction as unsecured. (*Id.* at 50).

MEMORANDUM OPINION - 4

Corliss transferred the $50,000 to Mastro in January 2011, through a series of six checks. (Dkt. No. 221-5 at 19). He issued three checks on January 17, 2011, in the amounts of $9,000, $9,000, and $7,000, and three checks on January 28, 2011, in the amounts of $9000, $9,000, and $7,000 -- totaling $50,000. (Dkt. No. 221-3 at 30-49). On March 18, 2012, Corliss asked King, his executive assistant, whether he could "get the checks that we gave to Mike Mastro and figure out where they got [deposited] from his end." (Dkt. No. 221-5 at 37). Corliss explained his behavior, saying "[a]s a general rule…when I'm lending money to people…I like to try to track what they're doing with it." (Dkt. No. 221-5 at 22). Corliss could not recall what he learned. (*Id.*).

Around the same time, Mastro transferred 68 ounces of gold to Corliss, in the form of 66 gold bars and two gold coins (the "**Gold**").[6] (Dkt. No. 221-4 at 12, Dkt. No. 221-5 at 15; Dkt. No. 221-1 at 5; Dkt. No. 221-2 at 5). The Gold was valued by Mastro as being worth approximately $100,232. (Dkt. No. 221-4 at 15, 29). Corliss asserts that although he did not require collateral as a condition of making the asserted $50,000 loan, Mastro gave him the Gold as collateral. (Dkt. No. 221-4 at 3-4, 7; Dkt. No. 221-5 at 8, 12-15). Corliss did not inquire about Mastro's solvency or financial condition. (Dkt. No. 221-5 at 9-10). Corliss did not ask Mastro why he needed a loan if he had over $100,000 worth of Gold. (*Id.* at 16-17). They did not execute a security agreement. (Dkt. No. 221-5 at 8). Corliss "frankly thought it was odd," as he had "never had gold as security for a loan." (Dkt. No. 221-4 at 4; Dkt. No. 221-5 at 16). Corliss stored the Gold in his personal safe and did not ever attempt to return the gold to Mastro. (Dkt. No. 221-4 at 4; Dkt. No. 221-1 at 5; Dkt. No. 221-2 at 4).

---

[6] In addition to the Gold referenced in the Trustee's and Corliss' motions for summary judgment, Mastro had other gold assets - both disclosed and undisclosed. As set forth in the Stipulated Judgment, Mastro purchased 100 "Gold Bars" pre-petition. (*See* 09-01439-MLB, Dkt. No. 626 at 5). Corliss ultimately turned over to the Trustee 66 1-oz. gold bars, and 2 1-oz. gold coins. Despite the discrepancy in the number of gold bars, I conclude the parties' references to the gold herein is the same as, or at least a portion of, the "Gold Bars" purchased by Mastro pre-petition, as referenced in the Stipulated Judgment.

MEMORANDUM OPINION - 5

Although the Gold was not listed in Mastro's bankruptcy schedules, it is undisputed that the Gold was undisclosed property of the estate. (09-01439-MLB, Dkt. No. 824 at 46). Corliss disclaims knowledge that the Gold was property of the estate. (Dkt. No. 221-5 at 17). Corliss assertedly believed that "at that point after having been in bankruptcy as long as he was . . . that was [Mastro's] property, not property of the estate." (Dkt. No. 220-1 at 84). Corliss asserts he did not sell the Gold because "it didn't seem to me to be sort of my gold . . . it was collateral for a loan." (Dkt. No. 221-4 at 7).

In February 2013, Corliss asserted Mastro had not made any payments on the $50,000 note. (Dkt. No. 221-3 at 7).

e. Corliss Accepts Mastro's Inheritance Funds

On April 4, 2011, Mastro told Plischke that he had reviewed the proposed distribution for the Campbell estate and that it "look[ed] very fair." (Dkt. No. 221-6 at 11-12, 20). He instructed her to "please mail me two checks as per my letter of 8/1/2010." (*Id.*).

Around April 11, 2011, pursuant to Mastro's prior instruction, Plischke issued two cashier's checks to Corliss. (Dkt. No. 221-6 at 15-16). The cashier's checks were made out as payable to Investco, in amounts of $55,800 each - totaling $111,600 (the "**Inheritance Funds**"). (Dkt. No. 221-4 at 20, 25-28; Dkt. No. 221-6 at 22-23). Corliss assertedly does not know why the checks were made payable to Investco. (*Id.* at 20-21; Dkt. No. 221-5 at 5). The Inheritance Funds were not property of the estate, as Mastro first became entitled to the funds more than 180 days post-petition. *See* 11 U.S.C. § 541(a)(5).

After Corliss received the checks, he endorsed one of the checks. (Dkt. No. 221-4 at 20; Dkt. No. 221-5 at 6.). Both checks were then deposited into his personal account at JPMorgan Chase bank. (Dkt. No. 221-4 at 20-21).

MEMORANDUM OPINION - 6

On or about May 3, 2011, Corliss and King opened a bank account at Heritage Bank. (Dkt. No. 235-19). The Heritage Bank account named Corliss and King as joint holders of the account with rights of survivorship. (*Id.*) Both Corliss and King assert that King being named as a joint account holder with rights of survivorship was an error. (Dkt. No. 220-1 at 76-77, 120). On or about May 20, 2011, King transferred the Inheritance Funds, at Corliss' direction, from Corliss' personal JP Morgan Chase account to the Heritage Bank account. (*Id.* at 121).

Later, in October 2013, Corliss asserted that the $111,600 of Inheritance Funds was received as payment on his outstanding loans to Mastro. (Dkt. No. 221-4 at 16). He repeated that assertion in October 2016. (Dkt. No. 221-5 at 3). Corliss assertedly recalls Mastro saying that he was "sending me some money to pay down the loan," and that he "would like to be able to borrow back again like it was a line of credit or a business transaction." (Dkt. No. 221-4 at 17, 19). At the time the Inheritance Funds were received, the $111,600 was far more than what was allegedly owed. (*See id.*)

### f. Stipulated Judgment in Mastro's Bankruptcy

On or about April 25, 2011, Mastro stipulated to a judgment in favor of the Trustee which avoided various transfers that Mastro and Linda had made into various asset protection LLCs and trusts (the "**Stipulated Judgment**") (Dkt. No. 218-1; 09-01439-MLB, Dkt. No. 626). Among other things, it awarded monetary judgments against Mastro and his marital community totaling more than $6 million, and required Mastro to turn over to the Trustee the gold bars purchased pre-petition, various furnishings and fixtures, and various jewelry. (*See id.*).

### g. Corliss Transfers Mastro $25,000 on April 26, 2011

On or about April 26, 2011, Corliss transferred $25,000 to Mastro. Mastro assertedly signed a promissory note identifying the transaction as unsecured. (Dkt. No. 221-3 at 52). In February 2013, Corliss asserted that Mastro had not made any payments on the April 2011 note. (Dkt. No. 221-3 at 8).

MEMORANDUM OPINION - 7

h. <u>Corliss Transfers Mastro $25,000 on May 24, 2011</u>

On or about May 24, 2011, Corliss transferred $25,000 to Mastro. Mastro assertedly signed a promissory note identifying the transaction as unsecured. (Dkt. No. 221-3 at 54). In February 2013, Corliss asserted that Mastro had not made any payments on the May 2011 note. (Dkt. No. 221-3 at 8).

i. <u>Corliss Transfers Mastro $25,000 on June 16, 2011</u>

On or about June 16, 2011, Corliss transferred $25,000 to Mastro. Mastro assertedly signed a promissory note identifying the transaction as unsecured. (Dkt. No. 221-3 at 56). In February 2013, Corliss asserted that Mastro had not made any payments on the June 2011 note. (Dkt. No. 221-3 at 10).

j. <u>Turnover and Preservation Order in Mastro's Bankruptcy</u>

On June 17, 2011, I vacated a prior order that had concluded that two valuable rings - a platinum ring with a 27.80 carat pear shaped diamond and a 14 carat white gold ring with a 15.93 carat round diamond (the "**Diamond Rings**") - were the separate property of Linda Mastro. (Dkt. No. 218-2, 09-01439-MLB, Dkt. No. 706). I ruled that I would determine ownership of the Diamond Rings, and whether they were property of the estate, as part of an upcoming trial in *Rigby v. Mastro*, et al., 09-01439-MLB. (*Id.*).

On June 20, 2011, in light of the upcoming trial, I ordered Michael and Linda Mastro (the "**Mastros**") to preserve and/or turnover certain property that was potentially property of the estate. (09-01439-MLB, Dkt. No. 704). Specifically, I ordered them to deliver the Diamond Rings to a Seattle jeweler for safekeeping. I further ordered them to preserve their household furnishings, fixtures, and wine collection. (*Id.*).

k. <u>The Mastros Flee to Canada</u>

By July 1, 2011 at the latest, the Mastros had left for Vancouver, Canada. They then traveled to Toronto. (Dkt. No. 220-1 at 135).

MEMORANDUM OPINION - 8

l. <u>Corliss Communicates with Mastro after the Mastros Flee</u>

On July 4, 2011, a call was placed to Corliss from a phone associated with Mastro. (Dkt. No. 221-5 at 23). The call lasted for six minutes. (*Id.*). Corliss asserts he does not remember the call. (*Id.*)

Around July 13, 2011, Mastro faxed Corliss a letter dated July 13, 2011 on letterhead from a hotel in Winnipeg. (Dkt. No. 221-4 at 22; Dkt. No. 221-5 at 23-24). Corliss asserts he does not recall seeing this letter. (Dkt. No. 221-4 at 22; Dkt. No. 221-5 at 24).

On July 14 and 15, 2011, the Seattle Times published articles that the Mastros had missed deadlines to hand over the Diamond Rings, and had vanished. (Dkt. Nos. 221-1 at 8; 221-2 at 5).

m. <u>Sanctions</u>

On or about July 12, 2011, I issued sanctions against the Mastros due to their refusal to comply with my June 20, 2011 Order. (Dkt. No. 218-3).

n. <u>Corliss Continues to Communicate with Mastro</u>

On or around July 18, 2011, Mastro faxed Corliss a request for $94,504 wherein he stated that his "preference would be a loan and I can send you more collateral." (Dkt. No. 221-4 at 30). The fax was received at Corliss' office at Investco. (*Id.*). The request was written on Ritz Carlton Hotel Toronto letterhead and included instructions to wire the funds to Mastro's account at the Royal Bank of Canada. (*Id.*). Corliss asserts he does not specifically recall the correspondence. (Dkt. No. 221-4 at 22-23; Dkt. No. 221-5 at 28). The correspondence was stored in Corliss' safe. (Dkt. No. 221-4 at 23).

Also on July 18, 2011, a call was placed from a phone associated with Mastro to Investco's offices. (Dkt. No. 221-5 at 24). The call lasted for about seven and a half minutes. (Dkt. No. 221-5 at 24). Corliss and King both assert they do not remember the call. (Dkt. No. 221-5 at 24; Dkt. No. 221-7 at 3). However, King emailed Corliss that same day and reported that, "Mike Mastro called—said he's left you a few messages and hasn't heard back from you. I explained you were out of town and would

MEMORANDUM OPINION - 9

try to contact him when you had a chance. He can be reached at 604-362-7574." (Dkt. No. 221-5 at 40, Dkt. No. 221-7 at 14). Corliss asserts he does not recall discussing the matter with King or recall what the messages were about. (Dkt. No. 221-5 at 25).

On July 19, 2011, King again emailed Corliss requesting to talk about Mastro. (Dkt. No. 221-7 at 5, 15; Dkt. No. 221-9 at 2).

On July 20, 2011, King again emailed Corliss asking, "Did you look at the numbers and have any additional comments?" (Dkt. No. 221-7 at 6, 16). She sent the email because she needed a response from Corliss. (*Id.* at 6). She asserts she does not recall if she got additional comments from Corliss. (*Id.*).

### o. Corliss wires Mastro $94,504

Corliss acknowledges that at some point he and King discussed him loaning Mastro additional money (Dkt. No. 221-4 at 23; Dkt. No. 220-1 at 124-26), and that he instructed King to wire $94,500 to Mastro. (Dkt. No. 220-1 at 125; Dkt. No. 221-3 at 19; Dkt. No. 221-4 at 23; Dkt. No. 221-5 at 28, 30). Corliss asserts that "[n]o moneys would have been sent to [Mastro] without [King] getting an okay from me." (Dkt. No. 221-4 at 23). On or about July 21, 2011, King wired $94,504 to Mastro's Royal Bank of Canada account. (Dkt. No. 2201- at 126). No promissory note was ever prepared or signed for these funds. (Dkt. No. 220-1 at 125). King does not recall if she spoke with Mastro after she sent the wire transfer. (Dkt. No. 221-7 at 7).

### p. The Mastros Flee to Europe

The Mastros subsequently used $66,525 of the $94,500 to charter a private jet to fly from Newfoundland to Portugal. (Dkt. Nos. 218-7, 218-8). They also used $2,555 of the wire funds to ship their Range Rover sport utility vehicle (the "**Range Rover**") from Toronto to Portugal. (Dkt. No. 218-9).

MEMORANDUM OPINION - 10

On July 24, 2011, the Mastros departed Newfoundland. (Dkt. No. 220-1 at 136). They arrived in Lisbon, Portugal on July 25, 2011. (*Id.*) The Trustee asserts the Mastros fled with valuable estate property, including the Range Rover, the Diamond Rings, jewelry, and other personal property set forth on Exhibit A to the Second Amended Complaint. (Dkt. No. 218-5, 221-1 at 9-10.).

q. King emails Corliss regarding the Mastros' Disappearance

On or about July 22, 2011, King emailed Corliss a news article from the Puget Sound Business Journal, with the following headline: "No diamonds, and now no Mastros as bankruptcy case unwinds." (Dkt. No. 221-7 at 7, 17-18). The article discusses the order to turn over the diamonds, the imposition of sanctions and that the Mastros could not be located, whether by telephone, facsimile or email. (*See id.* at 221-7 at 17-18). Corliss asserts he first learned that Mastro had left the country by reading about it in the newspaper, sometime during the weeks after they left. (Dkt. No. 221-4 at 5).

r. The Mastros are Pursued by Law Enforcement

The Mastros were pursued by federal authorities, including the U.S. Marshals Service. The Trustee read news reports in September 2011 indicating that the U.S. Marshal's Service had tracked the Mastros to a Canadian apartment "that [the Mastros] had vacated a day or two earlier."

On July 29, 2011, I issued bench warrants for the arrest of the Mastros for their willful disobedience of the June 20, 2011 Order.[7] (Dkt. No. 218-4).

On August 4, 2011, the Department of Justice filed a sealed criminal complaint against Mastro for bankruptcy fraud. (*United States v. Mastro*, No. MJ11-367 (W.D. Wash.), Dkt. No. 1). The District Court issued an arrest warrant under seal. (*Id.* at Dkt. No. 8).

---

[7] *Id.* at Dkt. Nos. 742, 768-79.

MEMORANDUM OPINION - 11

s. <u>Corliss emails Lauri regarding the Mastros' Disappearance</u>

On September 21, 2011, Corliss emailed his wife, Lauri, a copy of a Wall Street Journal article about the Mastros' disappearance and the fact that the U.S. Marshals Service was searching for them. (Dkt. No. 221-5 at 31, 48-51).

t. <u>The Mastros and Corlisses Communicate after the Mastros' Disappearance</u>

Less than nine months after the Mastros had fled to Europe, the Mastros and the Corlisses were communicating. On February 29, 2012, Linda emailed Lauri:

> Hi Lauri: How goes the battle? My Mike is bugging me to contact you to pay you for items purchased. Please let me know your thoughts. I know you said no problem but Mike hates to owe you money. Love to you both, Linda & Mike

Lauri replied:

> Linda, Been thinking about you. We are heading to the desert for a couple of weeks of sunshine in a few days. How are things going for you? Has the dust settled at all? When you and Mike are comfortable exchanging your things, we are ready, but in no hurry. It's your call. My Mike thought that you may want some of your stuff sooner rather than later. He thought maybe we could ship it to a hotel of your choice and you could pick it up there when convenient. Just an idea. We'll wait to hear your thoughts. Lauri

On March 11, 2012, Linda replied:

> Dear Lauri: Will keep in touch. If you could keep storing for just a bit more. We were contacted about Coming [sic] home. We are checking it out. Please keep that info to yourself. I know you are enjoying the desert. Rest and relax. Love and kisses, Linda

On March 23, 2012, Linda emailed Lauri:

> Hi Lauri: We would like to wire you monies owed. Could you give us the amt. again and the bank you think is the most safe. I just am afraid someone working in the bank will alert the trustee. I am so paranoid but I guess with good reason. Any chance you are coming back to Europe? We could work something out if that is the case. If you think the bank is safe, we need the wiring numbers. We are not coming home. Such is life. We

MEMORANDUM OPINION - 12

are moving shortly and if you would kindly keep the things for a few more months, it would be greatly appreciated.  Love to you, Linda

(Dkt. No. 235-33 at 1-2, Dkt. No. 235-34).

## F.     The Trustee's Investigation

Following the Mastros' disappearance, the Trustee retained special counsel to launch an investigation.  (Dkt. No. 235-1 at 4-6).  Although the Trustee did not know for sure, he believed there was a likelihood the Mastros had fled with substantial estate assets.  (*Id.* at 6-8; Dkt. No. 220-1 at 156-57).  He believed Mastro was a shrewd individual, who had always had significant assets, who would not likely flee without a "Plan B."  (Dkt. No. 235-1 at 7).

One of the Trustee's experts, an asset recovery professional stated that,

> [B]ased upon what [the Trustee] knew as of July 2011 when the Mastros fled, it was reasonable for him to assume that they had parked some liquid assets of an amount sufficient to support what they perceived to be the rest of their life in a comfortable lifestyle . . . Somewhere north of $15 million. And as much as hundreds of millions of dollars US.

(Dkt. No. 220-1 at 51).  His opinion was that "whether or not the Mastros fled, [his] advice to a trustee in this circumstance would be to undertake investigations."  (*Id.* at 53).

The Trustee also believed there was a "due diligence aspect" to his investigation.  (Dkt. No. 235-1 at 7).  The funds in the estate available for distribution would have provided creditors with only about a 1% return on their claims.  (Dkt. No. 220-1 at 161).  The Trustee believed he had a "responsibility to do a quality investigation into [Mastro] and his assets" to try to determine if Mastro took any assets which the Trustee could recover.  (Dkt. No. 235-1 at 9).  He believed he needed to carry an investigation to an end to determine that there were no assets, or do enough work to satisfy creditors that he did "what could reasonably [be] done" to investigate. (Dkt. No. 235-1 at 7).

By January 2012, the Trustee knew that Mastro had fled Canada, and special counsel knew that the Mastros had been in Portugal.  (Dkt. No. 220-1 at 179).  In early 2012, special counsel investigated

MEMORANDUM OPINION - 13

the remote destinations of the Isle of Man (due to the Mastros' trip there in 2010) and Belize (due to a transaction there in 2009). Investigative efforts in Canada began in June 2012. (Dkt. No. 220-1 at 178-82).

On July 10, 2012, Steven Snyder ("**Snyder**"), an investigator retained by the Trustee, reported that the Mastros had informed the staff at a Toronto animal hospital that they would be traveling by private jet to Lisbon, Portugal. (Dkt. No. 220-1 at 211). In that same report, Snyder concluded "[i]t is believed the Mastro's [sic] traveled from Canada to Lisbon, Portugal and may remain in that city." (*Id.* at 212).

On August 3, 2012, Snyder reported that the Mastros had apparently stayed at the Toronto Ritz Carlton from July 15, 2011 to July 21, 2011, and that while there they had made numerous phone calls to travel agencies and shipping companies. (*Id.* at 214-15). He further reported that "[a]dditional efforts are continuing with RBC Royal Bank in Canada in [sic] attempt to identify if the Mastro's [sic] maintain or maintained any deposit accounts or a safe deposit accounts within that bank." (*Id.* at 215).

On August 7, 2012, Snyder specifically identified a personal checking account at RBC Royal Bank of Canada, on which Mastro was the sole signatory. (*Id.* at 220-2 at 2). He further provided the Trustee's special counsel with information regarding activity in the account. (*Id.*) He reported, in part, that Mastro received a deposit of $89,157.30 (Canadian) on July 22, 2011 from "TT Michael J. Company," and paid $66,525 to private air charter Jet Port, Inc. (*Id.*) The Trustee's counsel responded on August 7 by asking whether the deposit could have been a wire transfer from "Michael J. Corliss." (*Id.* at 5-6). Snyder indicated he could not clearly make that connection. Dkt. No. 238 at 3

On August 9, Snyder confirmed some of the details of the flight to Portugal. He reported that the Mastros had boarded a private chartered jet in Toronto on July 24, 2011, and that they arrived in Lisbon, Portugal on July 25, 2011. (Dkt. No. 220-2 at 8-9).

MEMORANDUM OPINION - 14

Despite ongoing search efforts, as of October 11, 2012, the Trustee still had not located the Mastros. (Dkt. No. 220-1 at 138). Shortly thereafter, the Trustee retained Focus, Ltd., a U.K. private-investigation firm ("**Focus**") to locate the assets of the Mastros to determine how they were paying to live abroad and remain as fugitives. (Dkt. No. 235-18 at 5).

## G.    The Mastros' Arrest and Recovery of Estate Assets

The Mastros were eventually located, and arrested on October 24, 2012 by the French authorities in France. (Dkt. No. 218 at 2). Given the criminal charges pending against the Mastros, the Federal Bureau of Investigation and Department of Justice also was involved. (*See* Dkt. No. 220-2 at 84-87).

The French authorities took possession of property on the person of the Mastros when they were arrested. (Dkt. No. 218 at 2). On November 5, 2012, an order was granted in France recognizing the Trustee's standing and, *inter alia*, appointing a bailiff to change the locks on the Mastros' apartment, make an inventory of the personal property, confiscate that personal property, image the Mastros' electronics and get asset information from third parties. (*Id.*). On November 6, 2012, the French bailiff entered the Mastros' apartment, changed the locks, confiscated various property, imaged the navigation in their Range Rover, and created an inventory. (*Id.*). On November 20, 2012, all of this property and inventory was turned over to the French authorities pursuant to criminal proceedings against the Mastros. (*Id.*). Additional property, including jewelry, was subsequently recovered by the FBI. (Dkt. No. 218-5 at 14).

In France, in all, the Trustee recovered a significant number of estate assets -- including the Mastros' Range Rover, the Diamond Rings, and other personal property - including designer clothing, shoes, and purses, and a large amount of jewelry as identified in Exhibit A to the Second Amended Complaint (the "**Recovered Assets**") (Dkt. No. 218 at 3-4; Dkt. No. 218-5). It is disputed exactly how the Recovered Assets were acquired and how and when they were diverted to France. (Dkt. No. 220-1

MEMORANDUM OPINION - 15

at 190).   The Range Rover was sold by the French authorities for the benefit of Mastro's estate.  (Dkt No. 218 at 4).  The other Recovered Assets – including the Diamond Rings, the designer clothing, shoes, purses, and the jewelry -- were transported to Seattle, Washington, and ultimately sold for the benefit of the estate.  (Dkt. No. 218 at 4, Dkt. No. 218-5 at 14, Dkt. No. 220-2 at 100, 102, 104).  The Diamond Rings were sold on consignment.  (Dkt. No. 220-2 at 100, 102).[8]

## H.    The Trustee's Investigation after the Mastros' Arrest

Following the recovery of the Recovered Assets in France, the Trustee continued to search for hidden assets through special counsel and five vendors who performed investigative work.

Snyder continued working, including investigation into the Mastros' flight from Canada to Portugal, American and Canadian bank accounts, and Plischke.  (*See* Dkt. No. 220-2 at 122-32).

Focus also continued working, including additional research in the Isle of Man and Geneva.  (*See* Dkt. No. 220-2 at 134-38).

In March 2013, the Trustee retained Celerity Consulting Group.  Celerity performed imaging services for, and searches of, data from several of the Mastros' electronic devices that the FBI recovered.  (*See* Dkt. No. 220-2 at 140-41; Dkt. No. 235-18 at 7).

In October 2013, the Trustee's special counsel retained Sylint Group to perform two primary tasks.  First, it performed data analysis on the data Celerity and the FBI had reviewed. Second, it analyzed devices the Trustee obtained from Michael K. Mastro—Mastro's son.  Sylint understood that the Trustee was looking for "banking information."  (*See* Dkt. No. 220-2 at 160-61, 168-69).

Also in late 2013, the Trustee's special counsel retained CS Enquêtes for surveillance, to follow the Mastros in France "to find out where they banked" and "to find a credit card account that we're not

---

[8] *See also* 09-16841-MLB, Dkt. Nos. 3405 (sale of clothing, shoes, and purses in June 2014); 3423 and 3468 (sale of diamond rings in October and November 2014); 3478 (sale of jewelry by U.S. government in or about November 2014).

MEMORANDUM OPINION - 16

familiar with so that we could subpoena the records from the credit card company." (Dkt. No. 220-1 at 168-69; Dkt. No. 235-18 at 7).

As a result of the efforts of the Trustee, his special counsel, and his vendors, the Trustee was able to identify several bank accounts in France and Canada. (Dkt. Nos. 235-8, -15). However, the Trustee has not established the existence of any assets beyond the Recovered Assets.

**I. Corliss' Interactions with the Trustee**

1. Corliss' August 2012 Declaration

In or about May 2012, the Trustee's counsel inquired of Corliss regarding his prior dealings with Mastro. In lieu of a Bankruptcy Rule 2004 Examination ("**2004 Examination**"), Corliss agreed to provide information in a declaration. (Dkt. No. 217 at 2). Following discussions between the Trustee's counsel, Corliss, and Corliss' counsel, the Trustee's counsel drafted a declaration detailing the transactions between Mastro and Corliss (the "**Declaration**"). (Dkt. No. 218-6; Dkt. No. 220-2 at 36, 44). The Declaration was edited by Corliss' counsel and signed by Corliss on August 20, 2012. (Dkt. No. 220-2 at 53, 55). Corliss acknowledged in his Declaration that the "Trustee…requested that I provide information about my prior dealings with Michael R. Mastro…in connection with his search for assets…The testimony in this declaration is in response to his request." (Dkt. No. 218-6 at 2).

The Declaration, signed under penalty of perjury, provided in relevant part that:

> 10. With my permission, Mr. Mastro stored some of his personal property in a warehouse in the Big Horn [California] area in which I hold an ownership interest. The warehouse stored Mr. Mastro's personal property at no charge, without any written rental agreement, and while his bankruptcy case was pending.

> 11. While his bankruptcy case was pending, on one or more of the occasions during which I saw Mr. Mastro in the Big Horn area he indicated that he was short of cash. I agreed to loan him some money and later made a series of loans to him.

MEMORANDUM OPINION - 17

12.  A true and accurate summary of these loans is . . . attached hereto and entitled "MJC Payments to Michael Mastro."

13.  I have not received any payments on those loans from Mr. Mastro or any other party.

14.  Other than the loans described in paragraphs 12, 13 and 14, and the rental transaction described in paragraph 10, neither I nor any business or entity in which I hold an ownership interest had any business dealings or engaged in an [sic] transactions with Mr. Mastro or any company or entity in which he has or had an ownership or other interest.

15.  To the best of my knowledge, other than the loans described in paragraphs 12, 13, and 14, neither I nor any business or entity in which I hold an ownership interest has transferred any funds to Mr. Mastro, either directly or indirectly, subsequent to the commencement of Mr. Mastro's bankruptcy case.

16.  As of the date of this declaration, I have not seen or talked to Mr. Mastro for more than a year.

17.  I am not aware of anyone else who has either seen or talked to Mr. Mastro in the last year.

18.  I have no knowledge of any asset or assets in which Mr. Mastro continues to hold either a direct or indirect interest.

19.  As of the date on this declaration, I do not know the location of Mr. Mastro and Linda Mastro and have not had any knowledge of their whereabouts for more than a year.

(Dkt. No. 218-6 at 4-5).  The Declaration did not reference receipt of the Gold, receipt of $111,600 of Inheritance Funds, or the $94,500 wire transfer.  (*See id.* at 2-7).

The Trustee asserts that at the time Corliss provided his Declaration, the Trustee did not know that Corliss had wired $94,504 to Mastro in Canada, that Mastro had a Royal Bank of Canada account in Canada, that Corliss had communicated with Mastro, that Corliss was holding the Gold, that Mastro had transferred $111,600 of Inheritance Funds to Corliss, or the substance of the "loans" Corliss made to Mastro.  (Dkt. No. 218 at 3).  The Trustee asserts that he relied on Corliss' Declaration in investigating Mastro and his assets.  (*Id.*)

MEMORANDUM OPINION - 18

2. <u>Corliss' February 2004 Examination</u>

Corliss testified at a 2004 Examination in February 2013.  For the first time, he presented four "Promissory Notes Unsecured" relating to his loan transactions with Mastro.  (Dkt. No. 218 at 3).  He asserted that he had never been paid on any of the four loans he made from January to June 2011.  (Dkt. No. 221-3 at 6-10).  He further asserted that when Mastro asked for the loans, he "understood the risk; that there was a likelihood that he could never make a payment and that I would never be able to recover the money."  (Dkt. No. 221-3 at 11).  Corliss asserted that he never tried to collect any of the money Mastro owed him because if Mastro had the ability to pay him, he was "confident" that he would start to pay. (Dkt. No. 221-3 at 10-11).

Corliss further affirmed that the statements in his 2012 Declaration were still true, except for knowledge he had gained through reading the newspaper (Dkt. No. 221-3 at 17-18).  He affirmed that had not made any other loans or transferred funds to Mastro other than what was stated in his Declaration (*Id.* at 16), affirmed that he still had not seen or talked to Mastro for more than a year before the Declaration was signed (*Id.* at 16-17), and that he did not know of anyone else who had (*Id.* at 17), affirmed that he had no knowledge of any asset or assets in which Mastro continued to hold an interest (*Id.*), and affirmed that he did not know the location of the Mastros and had not had such knowledge for more than a year (*Id.*).   Corliss also asserted that he did not talk to Mastro after Mastro moved out of his house in California, and that he did not know where Mastro went after he moved out of the house.  *Id.* at 19).

Corliss did not disclose that he was holding the Gold, that he had accepted the Inheritance Funds, or that he and his wife had communicated with the Mastros after they left California in 2011.  (Dkt. No. 218 at 3).  When the Trustee asked Corliss if he had made a $94,500 wire transfer to Mastro, Corliss acknowledged that, "[Y]eah. It looks like I did." (Dkt. No. 221-3 at 19-20).  When asked why he didn't

MEMORANDUM OPINION - 19

include the $94,504 wire transfer in his 2012 Declaration, he said, "I don't know," and opined that he must have just looked for checks; not for wire transfers. (Dkt. No. 239-2 at 4).

### 3. Corliss Delivers the Gold to the Trustee

On October 17, 2013, Corliss delivered the 68 ounces of Gold to the Trustee's counsel. (Dkt. No. 221-4 at 8).

### 4. Corliss' October 2013 2004 Examination

On October 28, 2013, Corliss gave sworn testimony at another 2004 Examination. Corliss said he "turned the gold over to the trustee after hiring Mr. Coopersmith [counsel] and having a discussion with him about the notes, the gold, and the information that [the trustee was] requesting." (Dkt. No. 221-4 at 8). When asked why he had not disclosed the Gold in his 2004 Examination in February 2013, Corliss explained that it was his "background in depositions" to "answer the questions very directly, yes, no." (Dkt. No. 221-4 at 9). He assertedly was "waiting for [the Trustee] to ask [him] specifically about that transaction," and that he "assumed . . . that [the Trustee] would make inquiries." (*Id.*) He stated that other than the Gold, he had not received any other collateral. (Dkt. No. 221-4 at 10). When asked if if Mastro had ever given him cash as collateral, he said "No. And I wouldn't have taken cash as collateral. I mean, I thought gold was odd enough." (*Id.*) When asked about receipt of the $111,600 of Inheritance Funds, and why he had not previously disclosed them, he said he had not previously recalled the transaction. (Dkt. No. 221-4 at 16).

### Analysis

#### Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

MEMORANDUM OPINION - 20

judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323(1986). A fact is material if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a properly supported motion for summary judgment has been presented, the adverse party "may not rest upon the mere allegations or denials of his pleading." *Id.* Rather, the non-moving party must set forth specific facts demonstrating the existence of a genuine issue for trial. *Id.* at 256. While all justifiable inferences are to be drawn in favor of the non-moving party, when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *Matsushita Elec. Indus Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citations omitted).

### Discussion

The Trustee seeks summary judgment on his claims that (a) Corliss converted 68 ounces of gold that Mastro gave to him in January 2011, (b) Corliss aided and abetted Mastro in converting estate assets, (c) Corliss conspired with Mastro to convert estate assets, (d) Mastro fraudulently transferred $111,600 to Corliss, and (e) Corliss made fraudulent misrepresentations to the Trustee. The Trustee further asserts that an adverse inference should be applied against Corliss based on Mastro's invocation of the Fifth Amendment. Corliss and King seek summary judgment dismissal of the claims (a) against Corliss for conspiracy and aiding-and-abetting based on conversion of the assets recovered in France, (b) against Corliss for conversion of the gold, (c) against Corliss and King for fraudulent transfer, and (d) against Corliss for fraudulent misrepresentation.

MEMORANDUM OPINION - 21

**1.      Adverse Inference**

"In order to impute a third-party's Fifth Amendment invocation to another party, the party seeking to use the invocation must establish some relationship of loyalty between the other two parties." *See e.g., State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 U.S. Dist. LEXIS 6837 at *21 (N.D. Ill. May 11, 2000). "Courts that have addressed this issue have rejected bright-line rules, and instead have concluded that the party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference." *Id.* (considering imputation of the adverse inference in a summary judgment context). "Most of the courts that have imputed adverse Fifth Amendment inferences from one party to another have done so where there is a close family or business relationship between the person who exercised the Fifth Amendment right and the individual against whom an adverse inference is drawn." *Id.* at *22.

In determining whether application of the adverse inference is appropriate against a third party, many courts consider the non-exclusive factors set forth in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), including:  (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *Id.* at 123-24.  The overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for truth. *Id.* at 124.

The Trustee asserts that for purposes of summary judgment, I should apply the adverse inference against Corliss based on Mastro's invocation of the Fifth Amendment (the "**Adverse Inference**"). Corliss counters that the Adverse Inference would not be appropriate under the present facts and circumstances.  I decline to apply the Adverse Inference against Corliss at this juncture.

MEMORANDUM OPINION - 22

First, the Ninth Circuit has not addressed whether the adverse inference may be applied against a party based on a non-party's invocation of the Fifth Amendment. *See e.g., Schoenmann v. Salevouris*, 2016 U.S. Dist. LEXIS 147089, at *7-8 (N.D. Cal. Oct. 24, 2016).

Second, and most critically, the facts necessary for me to determine whether to apply the Adverse Inference are themselves disputed. The relationship between the parties is crucial in determining whether application of the adverse inference is appropriate. I have significant disputes of material fact regarding the nature and scope of the relationship between Mastro and Corliss, and the degree of control Corliss exercised over Mastro. Although Corliss asserts that he and Mastro had only limited social and business interactions, the Trustee points to circumstantial evidence in the record suggesting a far deeper relationship. Because I cannot resolve these essential fact disputes on summary judgment, I cannot determine whether application of the Adverse Inference is appropriate.

The trier of fact,[9] with the benefit of a more developed record, may possibly conclude that application of the Adverse Inference is appropriate at trial. Notably, even construing the facts most favorably to the Trustee, it appears that the relationship between Mastro and Corliss is not as strong as what would ordinarily be required to apply the adverse inference. Regardless, in considering the Trustee's motion for summary judgment, I conclude that I have sufficient grounds to deny each of the Trustee's requests for summary judgment against Corliss without having to consider how application of the Adverse Inference would affect the claims.

## 2. Corliss' alleged conversion of 68 ounces of Gold

In Washington, conversion is the act of "willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Public Util. Dist.*

---

[9] References to the "trier of fact" are actually references to Judge Lasnik -- sitting as the decision maker of both issues that are pure fact, and issues that are mixed questions of fact and law. Judge Lasnik referred this matter to me for all pretrial proceedings, but the trial will proceed in District Court before him.

MEMORANDUM OPINION - 23

*No. 1 v. Wash. Public Power Supply Sys.*, 104 Wn.2d 353, 378 (Wash. 1985). The term "willful" means "voluntary and intentional, but not necessarily malicious." *Black's* (2) *Law Dictionary* 1737 (9th ed. 2009); *cf. Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 159- 60 (Wash. 1998) ("Willful means merely that the person knows what he is doing, intends to do what is doing, and is a free agent.") (citations omitted).

"Wrongful intent is not an element of conversion, and good faith is not a defense." *Brown v. Brown*, 157 Wn. App. 803, 818, (2010). "Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action" in conversion." *Id.* (citations omitted).

The Trustee asserts that Corliss converted the 68 ounces of Gold that he accepted from Mastro in January 2011. The Trustee seeks damages for both diminution of the value of the Gold, as well as damages related to recapturing the Gold, but reserves any request for determination of the amount of damages for trial.

Corliss denies converting the Gold. Rather, he asserts the conversion claim should be dismissed because he assertedly (a) accepted the Gold as collateral for the loan he made to Mastro, (b) held the Gold as a bailee, (c) had no knowledge the Gold was property of the estate, and (d) returned the Gold after the Trustee asked for it. Corliss further asserts that even if the Trustee had a conversion claim against Corliss, the Trustee's only damages would be any diminution in value of the Gold from Corliss' storage of the Gold.

It is undisputed that Corliss voluntarily and intentionally accepted the Gold, that the Gold was property of Mastro's bankruptcy estate, that the Trustee was entitled to the Gold, and that the Trustee was deprived of its possession. However, the Trustee and Corliss fundamentally dispute the nature of the Gold transaction. Corliss asserts that he accepted the Gold as collateral in connection with an

MEMORANDUM OPINION - 24

asserted loan to Mastro, and that he had no knowledge the gold was property of the estate. The Trustee disputes that there was ever a loan or collateral, and asserts that Corliss willingly laundered the Gold to provide Mastro with cash.

Although the Trustee has no testimonial evidence to dispute Corliss' assertions, a significant amount of circumstantial evidence calls into question Corliss' characterization of events. For example, Corliss is a sophisticated businessman, and he disclaims having a close relationship with Mastro. Yet, he engaged in the non-ordinary course Gold transaction with Mastro, while Mastro was in bankruptcy, apparently without concern for the transaction's seeming irregularities. Corliss himself acknowledged that Mastro giving him the Gold was "odd." Moreover, the financial underpinnings of the transaction do not appear rational. Mastro purportedly gave Corliss over $100,000 of Gold as collateral for a $50,000 loan --notwithstanding that the promissory note purportedly documenting the transaction denominated the transaction as unsecured. Thereafter, notwithstanding several opportunities, Corliss did not disclose to the Trustee that he was holding the Gold -- either as collateral or in some other capacity. The trier of fact will need to make the necessary factual determinations regarding the true character of the Gold transaction.

The conclusions made by the trier of fact regarding the nature of the underlying transactions will determine what law applies.

a. If the trier of fact concludes Corliss laundered the gold, the conversion claim appears to be viable.

If the trier of fact concludes that Corliss' loan and collateral story is a sham and that Corliss willingly laundered the Gold to provide Mastro with cash, the conversion claim would appear to be viable -- regardless of whether Corliss was aware the Gold belonged to the estate. As set forth above, "[w]rongful intent is not an element of conversion, and good faith is not a defense." *Brown v. Brown*,

MEMORANDUM OPINION - 25

157 Wn. App. at 818. Even a purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter. *See* W. Page Keeton et al., *Prosser and Keeton on Torts* § 15 at 92-93 (5th ed. 1984). A mistake of law or facts is no defense. *Id.* "[T]he taking itself is wrongful, and the tort is complete without any demand for the return of the goods." *Id*. Thus, even if Corliss believed the Gold rightfully belonged to Mastro, and that he was merely laundering the Gold to help Mastro evade his ordinary judgment creditors (rather than participating in conversion of estate assets), he could still be liable to the Trustee for conversion.

b. If the trier of fact concludes Corliss made an actual loan and received the Gold as collateral, the law of bailment applies.

If the trier of fact concludes that Corliss accepted the Gold as collateral for a loan-- thereby creating a bailment --the applicable law differs. A bailment arises when "personalty is delivered to another for some particular purpose with an express or implied contract to redeliver when the purpose has been fulfilled." *Gingrich v. Unigard Sec. Ins. Co.*, 57 Wn. App. 424, 431-32 (1990). "With a bailment, ownership of the property remains with the bailor."

Washington law provides that a bailee can be held liable for conversion only if the bailee has "decisively indicated a repudiation of the right of the owner." *Guar. Nat'l Ins. Co v. Mihalovich*, 72 Wn.2d 704, 710 (1967). Therefore, if a bailment was created between Mastro and Corliss, the critical consideration in determining Corliss' liability to the Trustee, if any, will be the timing of his knowledge of the Trustee's ownership of the Gold.

Corliss asserts that because Mastro converted the Gold, prior to the asserted bailment, Corliss cannot be liable for converting the Gold. This is only partially accurate. As explained in American Jurisprudence,

> The bailee ordinarily acquires, by virtue of the bailment, no greater right
> in the property than the bailor had. Where the bailor has neither title to,

MEMORANDUM OPINION - 26

nor the right of possession of, the bailed property, the bailee cannot hold it as against the rights of the holder of a paramount title. A bailee who has <u>sufficient notice</u> of the title or paramount claim of the third person <u>must yield</u> to that claim or title, particularly where the true owner has made demand for the property, or has asserted title thereto and instructed the bailee to retain the property for the true owner's benefit. In cases where no demand has been made by the true owner, the bailee may safely return the property to the bailor, or deliver it to another, in accordance with the terms of the bailment, even after having received notice of the claims of the owner.

…

Where the bailor lacked title at the time of the bailment, if the bailee <u>wrongfully detains</u> the property <u>after demand by the true owner</u>, the latter may recover possession in an appropriate action, and the bailee may be held liable for the value of the use of the property during the time it is withheld from the owner.

8A Am. Jur. 2d Bailments §§ 55, 187 (emphases added).

Assuming the trier of fact concludes there was a legitimate bailment, he will then have to determine at what point Corliss became aware the Gold belonged to the Trustee, and what Corliss did with the Gold in the interim period before returning it to the Trustee. In situations in which there is a "valid dispute or conflicting claims to . . . personal property," a party may maintain possession of another's property, but "only for so long as reasonably necessary to determine the identity of the rightful claimant." *See Olin v. Goehler*, 39 Wn. App. 688, 694 (1985). However, if a party makes "no attempt to ascertain the rightful claimant's identity," then "alleged good faith is no defense to a claim of conversion." *Id.* Excluding a rightful owner's possession of their property for an unreasonable period of time is "willful interference" without 'lawful justification," and constitutes conversion. *See id.*; *see also* 8A Am. Jur. 2d Bailments § 189 ("On demand by an adverse claimant for delivery of the property, the bailee is entitled to a reasonable time and opportunity to investigate the real ownership, to determine what course to pursue, and to decide what steps to take to protect the bailor and bailee…").

On October 17, 2013, Corliss voluntarily surrendered the Gold to the Trustee. Corliss' return of the Gold does not necessarily preclude, but may significantly limit, the Trustee's claim for damages.

MEMORANDUM OPINION - 27

There is an insufficient record for me to conclude how long Corliss wrongfully detained the Gold, if at all.  Certainly the Trustee would be entitled to any diminution in the value of the Gold during the time Corliss may have wrongfully held the Gold.  If Corliss is found to have converted the Gold, certain recapture expenses may also be recoverable.

Corliss asserts that the Trustee cannot recover for search costs related to the Gold because he would have searched for gold generally, and for other assets, regardless of the existence of this particular Gold.  However, even if the Trustee was searching for other assets and the Gold simultaneously, some portion of search costs likely are attributable to the search for this particular Gold.  Without further explanation from the Trustee and a firm conclusion regarding the nature of the Gold transaction, I cannot decipher from this record what that portion of search costs may be.

For these reasons, I conclude I have genuine disputes of material fact regarding the Gold transaction that preclude me from granting summary judgment on the conversion claim as requested by the Trustee, or dismissing the claim as requested by Corliss.

**3.  Corliss' alleged aiding and abetting Mastro in converting estate assets and fleeing**

To prove "aiding and abetting" under Washington law, a plaintiff must show "(i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) that the aider and abettor substantially assisted in the primary wrong." *Calvert v. Zions Bancorp.*, 485 B.R. 604, 616 (Bankr. W.D. Wash. 2013) (collecting cases and referencing Restatement (Second) of Torts § 876(b)).

In showing an existence of a violation by the primary wrongdoer, there must ordinarily be an underlying tort. *See Calvert*, 485 B.R. at 618 (noting the underlying tort alleged to have been aided and abetted must be identified); *Lear v. Seattle Hous. Auth.*, 2014 U.S. Dist. LEXIS 35471, at *5 (W.D.

MEMORANDUM OPINION - 28

Wash. Mar. 17, 2014), *aff'd*, 616 Fed. App'x 299 (9th Cir. 2015) (noting that civil conspiracy is generally not a standalone cause of action; there must ordinarily be an underlying tort).

"Actual knowledge necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Calvert*, 485 B.R. at 617. "[A]ctual knowledge may be inferred and proven by circumstantial evidence." *Id.* A defendant's "conscious avoidance" of knowledge can be enough to satisfy the actual knowledge standard if "it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Id.*

Substantial assistance is shown when "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Id.* "An aider and abettor may be liable for damages even though his assistance of the scheme consists of mere silence or inaction." *Strong v. France*, 474 F.2d 747, 752 (9th Cir. 1973). "That liability arises…only when a duty to disclose has arisen." *Id.*

The Trustee seeks summary judgment on his claim that Corliss aided and abetted Mastro in converting estate assets - including the Gold and the Recovered Assets - and laundering the $111,600 of Inheritance Funds. The Trustee asserts that Corliss knew Mastro was engaging in a series of fraudulent actions related to his bankruptcy, Corliss knew that the Mastros were in the process of fleeing, and Corliss failed to disclose his communications and transactions with Mastro to the Trustee because he knew or suspected that Mastro's and his own actions were unlawful. The Trustee asserts Corliss substantially assisted Mastro in his conversion of estate assets by hiding estate assets, laundering the Gold, laundering the Inheritance Funds, providing Mastro with funds to flee to Europe with estate assets, and lying to the Trustee about his transactions with Mastro to help the Mastros escape further detection.

MEMORANDUM OPINION - 29

Corliss asserts that the aiding and abetting claim should be dismissed. He asserts that I have already held that the Trustee cannot assert vicarious-liability claims based on Mastro's contempt, Mastro's evasion of the Court's orders, or the Mastros' travel to Europe. He asserts the Trustee must base his claim on specific acts of conversion, which requires the Trustee to "specifically identify [the] assets or their value." He further asserts that Corliss did not know that Mastro intended to convert specific estate assets and that Corliss did not substantially assist Mastro in the conversion of specific estate assets. Finally, he asserts that even if Corliss were liable for aiding-and-abetting Mastro's conversion, the Trustee is at best entitled to nominal damages because he cannot prove a diminution in value, and the alleged expenses of recapture are not recoverable.

There appears to be no genuine dispute of material fact that Mastro engaged in tortious activity by converting estate assets. However, there are numerous genuine disputes of material fact regarding what, if any, knowledge Corliss had regarding Mastro's conversion of estate assets, and whether Corliss substantially assisted Mastro.

I note that since my ruling on the motion to dismiss, the Trustee has clarified the complaint to articulate the specific property he asserts that Mastro converted and for which he seeks damages. The Trustee asserts that Mastro converted the Gold, the Range Rover, and the Recovered Assets. Corliss asserts that he cannot be liable for aiding and abetting Mastros' conversion of estate assets unless he had knowledge regarding the conversion of each and every item listed by the Trustee in the complaint. This is inaccurate. If Corliss had knowledge Mastro was converting *any* estate assets, and was substantially assisting Mastro in converting *any* estate assets, he would not be any more or less liable if Mastro was converting a different amount of estate assets than Corliss initially understood. The amount of assets ultimately converted by Mastro is relevant to damages, but not directly to liability.

MEMORANDUM OPINION - 30

**Below is a Memorandum Decision of the Court.**

Although Corliss has asserted that he had no knowledge of Mastro's conversion of estate assets, the trier or fact could determine, based on circumstantial evidence, that Corliss had knowledge of Mastros' conversion, or consciously avoided accruing such knowledge. First, if the trier of fact were to conclude that Corliss knew Mastro converted the 68 ounces of Gold, then all of Corliss' future dealings with Mastro would be colored by the knowledge that Mastro was a "known converter." Providing a known 'converter' who has fled the country with laundered funds could foreseeably cause further conversion of estate assets. Second, the Gold transaction, the Inheritance Funds transaction, and wiring Mastro $94,500 while he was apparently in Canada, were all objectively non-ordinary course transactions with unusual terms and circumstances. The trier of fact may conclude that these transactions were too irregular for Corliss to undertake with a merely social friend without asking questions-- unless Corliss was trying to avoid knowing the reasons for the transactions. Corliss may have known or suspected that Mastro was converting estate assets. Finally, when Corliss was ultimately questioned by the Trustee regarding his interactions with Mastro, the information Corliss provided was apparently not complete and accurate. The trier of fact may conclude that Corliss made honest mistakes in collecting or recalling information, or he may conclude that Corliss was intentionally dishonest because he had knowledge he was involved in helping Mastro convert estate assets.

Corliss has also asserted that he did not substantially assist Mastro in conversion. It would seem that at least as to the $94,500 Corliss wired to Canada, those funds substantially assisted Mastro in converting estate assets. Regardless of whether the $94,500 was "Mastro's money" flowing from the Inheritance Funds which were not property of the estate, or whether it was a wholly unrelated new loan or cash infusion from Corliss, Corliss' provision of the money to Mastro at Mastro's request is what rendered the assistance. Although King technically sent the wire to Mastro, she did so at Corliss' express instruction.

MEMORANDUM OPINION - 31

**Below is a Memorandum Decision of the Court.**

The Mastros used the wired funds, in part, to hire a private jet to transport themselves to Lisbon Portugal, and to hire a shipping container service. Although it appears unclear exactly what the Mastros transported or shipped at that specific moment, the trier of fact will be able to draw logical inferences from circumstantial evidence and may conclude that the Mastros departed from Canada with a significant amount of estate assets in tow. The trier of fact may also conclude that Corliss' behavior after the Mastros fled -- including continuing to hold the Gold and failing to be forthright with the Trustee -- also substantially assisted Mastro in conversion of the Gold and some or all of the Recovered Assets.

It appears that the Trustee's search for hidden or converted estate assets was initially reasonable.[11] There were known, missing estate assets, and there was reason to believe other converted and/or hidden assets may exist. The Trustee undertook apparently reasonable means to conduct an investigation that was both broad and targeted where appropriate. Ultimately, the Mastros were located, and the Trustee obtained the Recovered Assets. Notably, the Recovered Assets were generally the same estate assets that were known to be missing around the time Mastro fled from Canada to Europe. The trier of fact could logically conclude, based on circumstantial evidence and reasonable inferences, that Corliss' provision of the $94,500 assisted Mastro in converting the entirety of the Recovered Assets.

Corliss suggests that damages are not recoverable because the Trustee would have undertaken the exact same investigation regardless of what actions Corliss took or what information he would have

---

[11] Certain property had not been determined to be property of the estate at the time it was allegedly taken to Europe by the Mastros. Specifically, in 09-01439-MLB, Linda was asserting that certain property, including the Diamond Rings and other jewelry, was her separate property. The Mastros logically may have suspected from my interim rulings that I would determine that Linda had no separate property, and at the time they fled they were in violation of various court orders to preserve and/or turn over that property. I entered my memorandum opinion in that lawsuit on September 27, 2011, determining that Linda had not proved she had any separate property, and that all of the property at issue was property of the estate. (*See* 09-01439-MLB, Dkt. Nos. 738, 824).

MEMORANDUM OPINION - 32

provided. Even assuming this was true, it does not necessarily mean that a portion of the investigatory costs could not be attributed to the portion of recovered estate assets which Corliss allegedly assisted Mastro in converting. In other words, even if the Trustee was simultaneously searching for or hoping to find other unknown assets, Corliss is not absolved of liability if he is found liable for assisting in converting or conspiring to convert some or all of the Recovered Assets. If the Trustee's investigation was even partially necessitated by Corliss' actions, Corliss will be liable for the portion of damages he caused.

The Trustee's investigatory costs following recovery of the Recovered Assets may be more difficult to justify as attributable to Corliss. The Recovered Assets were the estate assets that were known to be missing around the time Mastro fled from Canada to Europe, during the time of Corliss' asserted involvement in Mastro's conversion. At this point, discovery for this lawsuit has concluded, and the Trustee has not shown that there were additional hidden or converted estate assets beyond the Recovered Assets recovered in France. Therefore, following recovery of the Recovered Assets, continuing to search for assets *with a link to Corliss* seems less reasonable -- as all estate assets known to have been missing around the time Corliss is asserted to have aided and abetted or conspired with Mastro were recovered. Continuing to search for assets, in general, may not be unreasonable, as the Trustee has seemingly good reason to believe that additional, unknown assets may exist - out there, somewhere. However, any conceivable link between such unknown assets and Corliss seems far more remote.

For these reasons, I conclude I have genuine disputes of material fact that preclude me from granting summary judgment on the aiding and abetting claim as requested by the Trustee, or dismissing the claim as requested by Corliss.

MEMORANDUM OPINION - 33

**4. Corliss' alleged conspiracy with Mastro to convert estate assets**

To establish a civil conspiracy, a plaintiff must prove "that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *All Star Gas, Inc. v. Bechard*, 100 Wn. App. 732, 740 (2000). A plaintiff in a civil conspiracy action has the burden of proving the case by a preponderance of the evidence, and must establish the existence of the conspiracy by clear, cogent and convincing evidence. *Sterling v. Thorpe*, 82 Wn. App. 446, 450 (1996).

A finding that a conspiracy exists may be based on "circumstantial evidence, although the circumstances must be inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy." *Id.* at 451 (citations omitted); *see also Lyle v. Haskins*, 24 Wn.2d 883, 900 (1946) ("[S]ince direct evidence [of a conspiracy] is ordinarily in the possession and control of the alleged conspirators and seldom can be obtained, a conspiracy usually is susceptible of no other proof than that of circumstantial evidence."). A formal agreement is not essential to the formation of a conspiracy. *State v. Smith*, 65 Wn. App. 468, 471 (1992). "An agreement can be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." *Id.*; *see also Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) (noting that an agreement can be inferred by examining the "relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity)").

The Trustee seeks summary judgment on his claim for civil conspiracy, which overlaps substantially with his claim for aiding and abetting conversion. The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity. *See Halberstam*, 705 F.2d at 478. Incorporating the discussion regarding aiding and abetting, the Trustee further asserts that Corliss and Mastro agreed to participate in wrongful activity.

MEMORANDUM OPINION - 34

Corliss asserts that I should dismiss the claim for conspiracy because the Trustee cannot prove that Corliss combined with Mastro to accomplish the conversion of specific estate assets, and because the Trustee has no evidence of an agreement to convert those assets. Corliss further asserts that even if he were vicariously liable for Mastro's conversion, under a conspiracy theory, the Trustee is at best entitled to nominal damages because he cannot prove a diminution in value, and the alleged expenses of recapture are not recoverable.

I incorporate my discussion above regarding aiding and abetting, and further conclude that circumstantial evidence in the record could potentially be used to prove an agreement between Mastro and Corliss to convert estate assets. Although Corliss asserts he did not reach any agreement with Mastro to convert estate assets, the relationship and nature of transactions between Mastro and Corliss are highly disputed.

For these reasons, I conclude I have genuine disputes of material fact that preclude me from granting summary judgment on the conspiracy claim as requested by the Trustee, or dismissing the claim as requested by Corliss.

## 5. Alleged fraudulent transfer to Corliss of $111,600

RCW 19.40.041(a) provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor [was insolvent].

*Id.*

Actual intent must be proved by "clear and satisfactory proof." *Clearwater v. Skyline Constr. Co.*, 67 Wn.App. 305, 321 (Wash. Ct. App. 1992). In determining actual intent to hinder, delay, or defraud creditors, consideration may be given to the eleven badges of fraud enumerated in RCW

MEMORANDUM OPINION - 35

19.40.041(b). *Waldron v. Huber (In re Huber)*, 493 B.R. 798, 814-15 (Bankr. W.D. Wash. 2013). Circumstantial evidence of fraudulent intent may be considered. *Id.* at 814.

When there has been a fraudulent transfer, a creditor's remedy is to avoid the transfer to the extent necessary to satisfy the creditor's claim. RCW 19.40.071(a)(1). Pursuant to RCW 19.40.081(a), a transfer is not voidable under RCW 19.40.041(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee. Pursuant to RCW 19.40.081(b), to the extent a transfer is voidable under RCW 19.40.071(a)(1), the creditor may recover a judgment against (1) the first transferee of the asset, or (2) any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee.[12]  While the burden of proving fraudulent conveyance rests on the party so alleging, the burden of proving the defenses of good faith and reasonably equivalent value rest on the defendant. *See Davis v. Nielson*, 9 Wn. App. 864, 871 (1973).

---

[12] RCW 19.40.081 provides in relevant part:

(a) A transfer or obligation is not voidable under RCW 19.40.041(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

(b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under RCW 19.40.071(a)(1), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) The first transferee of the asset or the person for whose benefit the transfer was made; or

(2) Any subsequent transferee other than a good-faith transferee or obligee who took for value or from any subsequent transferee or obligee.

(c) If the judgment under subsection (b) of this section is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

(d) Notwithstanding voidability of a transfer or an obligation under this chapter, a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to:

(1) A lien on or a right to retain any interest in the asset transferred;

(2) Enforcement of any obligation incurred; or

(3) A reduction in the amount of the liability on the judgment.

MEMORANDUM OPINION - 36

The term "transferee" is not defined by the Uniform Fraudulent Transfer Act ("UFTA"), but "[t]he use of the word 'transferee' necessarily implies that the party receives the property." *General Elec. Capital Auto Lease v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801, 809 (9th Cir. B.A.P. 1995) (considering the term "transferee" under the California UFTA). A transferee "has dominion over the money or other asset, the right to put the money to one's own purposes." *In re Incomnet, Inc.*, 463 F.3d 1064, 1070 (9th Cir. 2006) (citations omitted); *see also Lacey Marketplace Assocs. II, LLC v. United Farmers of Albert Co-op Ltd.*, 107 F. Supp. 3d 1155, 1159 (W.D. Wash. 2015), *appeal filed*, No. 15-35571 (9th Cir. July 10, 2015) (interpretations of "transferee" under Bankruptcy Code apply to Washington's UFTA). The analysis focuses on "whether an entity had legal authority over the money and the right to use the money however it wished." *Incomnet*, 463 F.3d at 1070; *see also generally In re Dominion Corp.*, 199 B.R. 410, 413-15 (9th Cir. B.A.P. 1996) (defendant was "merely a conduit" for funds not a transferee).

The elements of good faith and reasonably equivalent value are separate elements the transferee must prove to establish a defense under 19.40.081(b)(1). "Good faith" is "not susceptible of precise definition." *Hayes v. Palm Seedlings Partners-A* (*In re Agric. Research & Tech. Gr., Inc.*), 916 F.2d 528, 536 (9th Cir. 1990). But to succeed on this defense, a defendant must show "objective good faith." *See In re Agricultural Research*, 916 F.2d 528, 539 (9th Cir. 1990).

Although the Inheritance Funds were not property of the estate, the Trustee was a judgment creditor based on the Stipulated Judgment. The Trustee seeks summary judgment on his claim that the conveyance of the $111,600 of Inheritance Funds from Mastro to Corliss was a fraudulent transfer under RCW 19.40.041(a)(1) made with actual intent to hinder or delay the Trustee. The Trustee further asserts that he is entitled to recover pursuant to RCW 19.40.071(a)(1) and RCW 19.40.081(a)-(b)(1).

MEMORANDUM OPINION - 37

Corliss seeks dismissal of the fraudulent transfer claim. He asserts that he accepted the $111,600 in good faith, on account of loans he had already made, or alternatively, as collateral for Mastro to "borrow against" in the future. He asserts that Mastro received reasonably equivalent value because Corliss loaned far more to Mastro than $111,600. He further asserts that there is no transfer for the Trustee to avoid because Corliss "returned" almost all of the $111,600 within a few months after receiving it - unwinding any asserted transfer.

It is undisputed that Corliss accepted the $111,600 of Inheritance Funds, deposited them into his personal account, and later transferred them to the Heritage Bank account. He was thus a "transferee." In addition, it appears based on circumstantial evidence that Mastro may well have transferred the Inheritance Funds to Corliss with actual intent to hinder, delay, or defraud his creditors. However, I conclude I have genuine disputes of material fact regarding Corliss' alleged good faith, reasonably equivalent value, and the nature of the underlying transaction.

a. Good Faith

Corliss asserts he acted in good faith. He points to the fact that he provided $169,500 to Mastro after receiving the $111,600, and asserts it is not bad faith to accept repayment of a loan or collateral. It is not necessarily bad faith to accept payments on, or collateral for, antecedent debts. *See e.g. Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43 (2d Cir. 2005). However, based on a significant amount of circumstantial evidence, the trier of fact could conclude that Corliss was not accepting repayment of a loan or receiving collateral, but rather that Corliss knew he was laundering the Inheritance Funds to help Mastro avoid his creditors.

First and foremost, under the circumstances it would make little business sense for Corliss to accept cash collateral for cash loans. Indeed, Corliss testified that he would not generally accept such an arrangement. Now he asserts that he did. Second, it is illogical that Mastro would pay Corliss $111,600

MEMORANDUM OPINION - 38

as repayment of the alleged $50,000 loan -- especially when Corliss was already holding over $100,000 worth of Gold as asserted collateral for the $50,000 loan. Third, Mastro arranged for the Inheritance Funds to be paid to Corliss, through Investco, in August of 2010 - far prior to the subsequent asserted loan and collateral transactions with Corliss. It is hardly conceivable that in 2010 Mastro was providing for repayment or collateral related to loans that did not exist until 2011. Fourth, had Corliss been acting in good faith, he arguably would have disclosed receipt of the $111,600 in his August 2012 Declaration or at his first 2004 Examination. Rather, he asserted he had never been paid on any of the alleged loans he had given to Mastro.

      b. <u>Reasonably Equivalent Value</u>

      Corliss asserts he provided reasonably equivalent value because he "unwound" the April 2011 transfer of $111,600 by providing Mastro with additional funds, including $94,504 in July 2011. In other words, he asserts he "returned" at least a portion of the funds. A fraudulent-transfer claim cannot stand where the transferor received "reasonably equivalent value" in exchange for the allegedly fraudulent transfer, or where the transfer is returned. *See* RCW 19.40.041; *Sedwick v. Gwinn*, 73 Wn. App. 879, 888-89 (1994); *In re Adeeb*, 787 F.2d 1339, 1344 (9th Cir. 1986) (noting that "transferred" means "transferred and remain[s] transferred"). "Value" is defined in RCW 19.40.031(a) to include a transfer in exchange for the satisfaction of an antecedent debt. *See Calvert v. Radford (In re Consol. Meridian Funds)*, 487 B.R. 263, 269 (Bankr. W.D. Wash. 2013). "[I]t is proper under appropriate circumstances to evaluate a series of transactions as a whole in determining whether reasonably equivalent value was received." *Hitt v. Ng (In re All Am. Bottled Water Corp.)*, 2009 Bankr. LEXIS 712, at *9-10 (Bankr. W.D. Wash. Mar. 17, 2009).

      Other than Corliss' after-the-fact explanations, the record does not suggest that the $94,504 Corliss wired to Mastro in Canada was intended to "unwind" any prior transfer or transaction. In fact,

MEMORANDUM OPINION - 39

the wire to Mastro in Canada appears unrelated to prior transactions between Corliss and Mastro. Mastro's request for the money to be wired to Canada appears to be a request for a new loan, and Mastro offered to give more collateral. There was no reference to the Inheritance Funds, other asserted collateral, or any prior transactions. However, depending on conclusions drawn by the trier of fact, Corliss' asserted return of funds may limit the damages flowing from the asserted fraudulent transfer.

For these reasons, I conclude I have genuine disputes of material fact that preclude me from granting summary judgment on the fraudulent transfer claim as requested by the Trustee, or dismissing the claim as requested by Corliss.

## 6. Alleged fraudulent transfer to King of $111,600

Corliss and King seek dismissal of the fraudulent transfer claim against King, asserting that she was not a "transferee" of any funds from Mastro, and that even if she was a transferee, she was a good faith subsequent transferee.

The Inheritance Funds were given to Corliss in the form of two checks made out to Investco. Those checks were first deposited in Corliss' personal bank account, and then later transferred to the Heritage Bank account jointly held by Corliss and King. Corliss and King assert that the Heritage Bank account was never intended to be a joint account, and that King was named on the account in that capacity in error.

The Trustee has not come forth with any evidence to genuinely dispute that King was on the account in a joint capacity due to error. The Trustee suggests that document opening the bank account "speaks for itself" in that Corliss and King selected a "joint – with survivorship" account rather than a "business purpose" account which could have allowed Corliss to select King as an agent signatory. However, the document alone is not enough to refute Corliss' and King's assertions that the account was

MEMORANDUM OPINION - 40

opened as a "joint – with survivorship" account by mistake. Rather, Corliss testified that King was often put on Corliss' bank accounts in an agent-like capacity.

In addition, nothing in the record, circumstantial or otherwise, suggests that King would have had an expectation of owning the funds in the Heritage Bank account had she outlived Corliss. Her actions were at all times consistent with her role as Corliss' executive assistant. Although King actually sent the $94,500 wire to Mastro in Canada, she did so at Corliss' explicit direction. The record does not suggest that she had any personal interest in the transaction, or any personal relationship with Mastro. Although the Trustee made vague references suggesting that mistake should not be believed because King's credibility is in question, the Trustee has also not come forth with evidence to genuinely dispute King's credibility. *See Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) ("A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment").

Therefore, I conclude that King was not a "transferee." She had no dominion over the funds in the Heritage Bank account, or the right to use the funds for her own purposes. For this reason, I grant King's request to dismiss the fraudulent transfer claim against her.

**7. Corliss' alleged fraudulent misrepresentations to the Trustee.**

In Washington, the elements of fraudulent misrepresentation include:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Adams v. King Cty,* 164 Wn.2d 640, 662 (2008).[13] "In proving claims of fraudulent concealment or

---

[13] The elements of fraudulent misrepresentation are the same as the elements for "classic" fraud. *See generally* 16 Wash. Prac., Tort Law and Practice § 19.1-.2. (4th ed.).

MEMORANDUM OPINION - 41

misrepresentation, a plaintiff can affirmatively plead or prove the nine elements of fraud, or may simply show that the defendant breached an affirmative duty to disclose a material fact." 16 Wash. Prac., Tort Law and Practice § 19.2 (4th ed.).

The Trustee asserts that Corliss made multiple false representations of existing material fact in his August 2012 Declaration, that Corliss' representations were knowingly false, that Corliss intended the Trustee to rely on them, that the Trustee was ignorant as to the falsity of Corliss' statements, and that the Trustee rightfully relied on them. The Trustee reserved any request for determination of the amount of damages for trial.

Corliss seeks dismissal of the fraudulent misrepresentation claim. He asserts that (i) numerous of the assertedly false representations were not proven to be false, and that (ii) for omission of a fact to be actionable as a fraudulent misrepresentation there has to have been a duty to disclose. Corliss further asserts (iii) that the Trustee did not justifiably rely on the alleged misrepresentations because he had knowledge of the facts that Corliss allegedly misrepresented from other sources, (iv) that the asserted misrepresentations were not material because the Trustee has not provided any evidence that a different response would have altered his investigation, (v) that the Trustee did not justifiably rely on Corliss' alleged misrepresentations, (vi) that the Trustee did not prove Corliss' knowledge of falsity or intent that the Trustee rely on his alleged misrepresentations, and (vii) that the Trustee has not proven any damages resulting from the misrepresentations.

a. Representations of Existing Facts and Falsity

The Trustee asserts that Corliss misrepresented in his Declaration that other than (i) a series of loans he made to Mastro totaling $125,000 and (ii) permitting Mastro to use a warehouse in which he had an ownership interest, "neither I nor any business or entity in which I hold an ownership interest has had any business dealings or engaged in any transactions with Mr. Mastro or any company or entity in

MEMORANDUM OPINION - 42

which he has or had an ownership or other interest." This was an apparent misrepresentation. Corliss had accepted 68 ounces of Gold from Mastro, accepted $111,600 of Inheritance Funds from Mastro, and wired Mastro $94,500. The Trustee asserts that Corliss misrepresented that other than the $125,000 loan and warehouse usage, "[n]either I nor any business or entity in which I hold an ownership interest has transferred any funds to Mr. Mastro, either directly or indirectly, subsequent to the commencement of Mr. Mastro's bankruptcy case." This was an apparent misrepresentation. Corliss had wired Mastro $94,504 while Mastro was in Canada. The Trustee asserts that Corliss misrepresented that in connection with allegedly loaning Mastro $125,000, he had "not received any payments on those loans from Mastro or any other party." This was an apparent misrepresentation if I were to accept as true Corliss' assertion that the $111,600 Inheritance Funds were given to him as repayment for the outstanding $50,000 loan.

Corliss asserts that these falsities were "omissions" that are not actionable as fraudulent misrepresentations because Corliss had no duty to disclose them. Corliss further asserts that the Trustee did not plead a duty for Corliss to disclose. Where there is a "duty on one party to disclose all material facts known to him and not known to the other, silence or concealment in violation of this duty" is "a deliberate suppression of the truth and equivalent to the assertion of a falsehood." *Boonstra v. Stevens-Norton, Inc.*, 64 Wn.2d 621, 625 (1964); *see also Alexander v. Sanford*, 181 Wn. App. 135, 177 (2014) ("the duty to disclose a material fact exists only where there is a fiduciary relationship" or from various quasi-fiduciary relationships). However, I conclude that Corliss' failures to disclose acceptance of 68 ounces of Gold, acceptance of $111,600, and transfer of $94,504 were *not* "omissions" that would only be actionable in the event there was an independent duty to disclose them. Rather, the existence of these undisclosed facts appear to render certain of Corliss' affirmative statements in his Declaration false. One cannot tell a falsehood and later claim the truth was an omission.

MEMORANDUM OPINION - 43

**Below is a Memorandum Decision of the Court.**

The Trustee further asserts that Corliss fraudulently misrepresented in his Declaration that he had not seen or talked to Mastro for more than a year, that he was not aware of anyone else who had seen or talked to Mastro in the last year, that he had no knowledge of any asset or assets in which Mastro continued to hold either a direct or indirect interest, and that he had no knowledge of the Mastros' location and had not for more than a year. Construing the evidence before me most favorably to Corliss, I cannot conclude that these statements in Corliss' Declaration were misrepresentations. However, after hearing all of the evidence the trier of fact may conclude otherwise.

Circumstantial evidence in the record suggests these statements may be untrue. For example, in February and March 2012, far less than a year prior to Corliss' Declaration, Lauri and Linda (Corliss' and Mastro's wives) were corresponding by email. The content of the emails suggests a close and ongoing relationship between the Corlisses and Mastros. They apparently demonstrate that the Corlisses knew the Mastros were in Europe, that the Corlisses were holding property for the Mastros, and that the Corlisses were willing to ship assets to the Mastros. In addition, the emails specifically reference the wives' conversations with their respective husbands regarding property being held for the Mastros and money owed to the Corlisses – suggesting that Corliss and Mastro must have known their wives were communicating.

Finally, the Trustee asserts that it was a fraudulent misrepresentation to omit discussion of the communications Corliss and/or King had with Mastro in July 2011 when Mastro was in Canada. Corliss' Declaration, signed in August 2012, said he had not "seen or talked to Mr. Mastro for more than one year." Since July 2011 was more than a year prior to August 2012, Corliss' statement appears to have been technically true with regard to the July 2011 communications. However, given the email exchange referenced above, the Trustee may be able to prove at trial that other communications rendered

MEMORANDUM OPINION - 44

this statement false. Nevertheless, the July 2011 communications were "omissions" for which the Trustee has not asserted a duty for Corliss to disclose.

b. <u>Materiality</u>

A fact is "material" if "a reasonable person would attach importance to the fact in determining his or her choice of action in the transaction." *Goel Jain*, 259 F.Supp. 2d 1128, 1140 (W.D. Wash. 2003). As to all of the asserted misrepresentations, they appear to be material. The transactions between Corliss and Mastro involved large sums of money, and the Trustee would have attached importance to details regarding Corliss' and Mastro's relationship, and Mastro's whereabouts.

c. <u>Trustee's Right to Rely.</u>

As to all of the asserted misrepresentations, it appears that the Trustee had a right to rely upon the statements made by Corliss in his Declaration. Corliss' Declaration stated that Corliss was providing the Declaration in response to the Trustee's request "for information about [Corliss'] prior dealings with [Mastro] . . . in connection with [the Trustee's] search for assets in that case." Corliss clearly understood the purpose of him providing the Declaration and must have understood that the Trustee would rely on it.

d. <u>Corliss' Knowledge of Falsity and Intent that the Trustee Act Upon His Statements</u>

"A person has actual knowledge of a fact when he or she is subjectively aware of its existence." *Michak v. Transnation Title Ins. Co.*, 108 Wn. App. 412, 425 (2001), *rev'd on other grounds by* 148 Wn.2d 788 (Wash. 2003). As to all of the asserted misrepresentations, I conclude it is genuinely disputed whether Corliss knew the statements were false and whether Corliss intended that they be acted upon by the Trustee.

Corliss has testified that he did not realize his Declaration was incomplete and asserts that the Trustee has failed to prove that he intended for the Trustee to rely on his representations. With regard to

MEMORANDUM OPINION - 45

his incomplete Declaration, Corliss blames a variety of factors – the attorneys who drafted his Declaration, his faulty search methods, and his own memory. For example, in explaining why he did not disclose the $94,504 wire transfer to Mastro, Corliss said, "I don't know," and suggested that he likely only searched for checks - not wire transfers. (Dkt. No. 239-2 at 4). Given the size of the wire transfer, his failure to recall the transaction at the time he gave his Declaration is questionable. I cannot conclude on summary judgment that he knew his Declaration was false or that he intended the Trustee to rely on his assertedly false statements. However, in light of the large size of the transactions and the circumstantial evidence of Corliss' involvement with Mastro, Corliss' explanations for his inaccuracies are questionable.

      e.  <u>Trustee's Ignorance of Falsity and Reliance on the Truth of Corliss' Representations</u>

"The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false, or its falsity is obvious to him." 16 Wash. Prac., Tort Law and Practice § 19.9 (4th ed.). "While justifiable reliance is normally a question of fact, summary judgment is appropriate if reasonable minds could reach but one conclusion." *Cornerstone Equip. Leasing, Inc. v. MacLeod*, 159 Wn. App. 899, 905 (2011). As to all of the asserted misrepresentations, I conclude it is genuinely disputed whether the Trustee knew the statements were false and whether the Trustee justifiably relied upon the truth of the representations.

Corliss asserts that the Trustee already knew the material facts assertedly misrepresented in or omitted from his Declaration and that, therefore, the Trustee could not have relied on the Declaration. Corliss then articulates a series of facts, and explains how the Trustee knew or could have known these facts from other sources. Although the Trustee's ignorance of falsity and justifiable reliance are disputed, it appears to me that the facts known by the Trustee from other sources were mere pieces of a puzzle that the Trustee was trying to assemble. For example, Corliss asserts that the Trustee had

MEMORANDUM OPINION - 46

knowledge of the wire transfer and Mastro's Royal Bank of Canada account at the time Corliss signed his Declaration. Indeed, on August 7, 2012, Snyder alerted the Trustee that there had been a wire transfer to Mastro's Royal Bank of Canada account. The Trustee's attorney then queried of Snyder whether the wire could have been sent by Corliss. (Dkt. No. 238 at 1). Snyder responded that he could not make any connection. (*Id.*; *see also* Dkt. No. 238 at 3). Corliss suggests these tidbits of information and inquiry constitute knowledge which should have precluded the Trustee's ignorance of falsity or reliance on his Declaration. Rather, it seems that the Trustee was missing critical pieces of information; information which was later apparently misrepresented in Corliss' Declaration. Even if the Trustee had pieces of information from which he could have drawn a number of various conclusions, that does not necessarily mean the Trustee did not take Corliss at his word or rely on his Declaration. "It is not essential that a misrepresentation be the sole or even predominant inducement so long as it is a material influence or a substantial factor in the plaintiff's decision to act or refrain from acting." "16 Wash. Prac., Tort Law and Practice § 19.9 (4th ed.). Inconsistent, additional, or even corroborating information still would likely have been relevant to the Trustee's investigation.

   f. <u>Damages.</u>

   The Trustee may recover damages that are "proximately caused by the [alleged] fraud." *Turner v. Enders*, 15 Wn. App. 875, 880 (1976); *see also Salter v. Heiser*, 39 Wn.2d 826, 832 (1951). As to all of the asserted misrepresentations, I conclude it is genuinely disputed whether the Trustee suffered damages as a result. The trier of fact may conclude that Corliss knew Mastro was fleeing from Canada to Europe, knew Mastro was absconding with estate assets, and knew where the Mastros were hiding in Europe all along. If true, this information could have substantially aided in the recovery of assets. However, until the trier of fact determines the actual nature of the transactions, the scope of Corliss' knowledge of and involvement in Mastro's conversion, the scope of the Trustee's knowledge of the

MEMORANDUM OPINION - 47

Mastros' whereabouts, and the scope of Corliss' alleged dishonesty with the Trustee, damages cannot be assessed.

For these reasons, I conclude I have genuine disputes of material fact that preclude me from granting summary judgment on the fraudulent misrepresentation claim as requested by the Trustee, or dismissing the claim as requested by Corliss.

### Conclusion

For the reasons set forth above, I dismiss the fraudulent transfer claim against King, and deny the balance of both the Trustee's and Corliss' motions for summary judgment.

Counsel for the parties should submit appropriate forms of order (a) granting summary judgment dismissal of the fraudulent transfer claim against King and denying the remainder of Corliss' motion for summary judgment, and (b) denying the Trustee's motion for summary judgment.

### /// END OF ORDER///

MEMORANDUM OPINION - 48